**4910-9X**

**DEPARTMENT OF TRANSPORTATION**

**Office of the Secretary**

**14 CFR Part 382**

**[Docket No. DOT-OST-2018-0067]**

**RIN 2105-ZA05**

**Guidance on Nondiscrimination on the Basis of Disability in Air Travel**

**AGENCY**:  Office of the Secretary (OST), U.S. Department of Transportation (DOT).

**ACTION**:   Final Statement of Enforcement Priorities Regarding Service Animals.

**SUMMARY**:   The U.S. Department of Transportation (DOT or the Department) is issuing a final statement of enforcement priorities to apprise the public of its enforcement focus with respect to the transportation of service animals in the cabin of aircraft.  The Department regulates the transportation of service animals under the Air Carrier Access Act (ACAA) and its implementing regulation, 14 CFR Part 382 (Part 382).

**DATES**:   This final statement is effective [INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER]

**ADDRESSES**:  For access to the docket to read background documents or comments received, go to https://www.regulations.gov and follow the online instructions for accessing the docket.

**FOR FURTHER INFORMATION CONTACT:**  Robert Gorman, Senior Trial Attorney, or Blane A. Workie, Assistant General Counsel, Office of Aviation Enforcement and Proceedings, U.S. Department of Transportation, 1200 New Jersey Ave., S.E., Washington, D.C., 20590, 202-366-9342, 202-366-7152 (fax), robert.gorman@dot.gov or blane.workie@dot.gov (e-mail).

**SUPPLEMENTARY INFORMATION:**

**Background**

On May 23, 2018, the Department published two documents relating to transportation of service animals. The first document was an advance notice of proposed rulemaking (ANPRM) seeking comment on amending the Department's Air Carrier Access Act (ACAA) regulation on the transportation of service animals. The Department published the ANPRM in response to concerns expressed by individuals with disabilities, airlines, flight attendants, and other stakeholders about the need for a change in the Department's service animal requirements. The ANPRM solicited comments on ways to ensure and improve access to air transportation for individuals with disabilities, while also deterring the fraudulent use of animals not qualified as service animals and ensuring that animals that are not trained to behave properly in public are not accepted for transport. The ANPRM comment period closed on July 9, 2018, with the Department receiving approximately 4,500 comments (Docket DOT-OST-2018-0068). The Department intends to issue a Notice of Proposed Rulemaking (NPRM) on the transportation of service animals by air after reviewing and considering the comments to the ANPRM.

Recognizing that the rulemaking process can be lengthy, on May 23, 2018, the Department's Office of Aviation Enforcement and Proceedings (Enforcement Office) also issued an Interim Statement of Enforcement Priorities (Interim Statement) to apprise the public of its intended enforcement focus with respect to transportation of service animals in the cabin. The Interim Statement addressed various topics regarding the transportation of service animals under the existing disability regulation, including: (1) types of species accepted for transport; (2) number of service animals that a single passenger may transport; (3) advance notice of travel

with a service animal; (4) evidence that an animal is a service animal; (5) check-in for passengers traveling with service animals; (6) documentation for passengers traveling with a service animal; and (7) leashing or containing a service animal while in the aircraft cabin. It was important for the Department to address these issues given confusion regarding current regulatory requirements on the transportation of service animals in the cabin of aircraft, considering new service animal policies that airlines instituted, and in light of disability rights advocates' view that some of these polices are unlawful.

Interim Statement

In the Interim Statement, we noted that our enforcement efforts would be focused "on clear violations of the current rule that have the potential to adversely impact the largest number of persons." 83 FR 23805-23806. With respect to animal species, we indicated that we would focus our enforcement efforts on ensuring that the most commonly used service animals (dogs, cats, and miniature horses) are accepted for transport as service animals. With respect to the number of service animals that an airline must allow a passenger to carry onboard the aircraft, we stated that as a matter of enforcement discretion, we did not intend to take enforcement action if an airline limits a passenger to transporting one emotional support animal (ESA), and two non-ESA service animals, for a total of three service animals, as the Department's service animal regulation does not indicate whether airlines must allow passengers to travel with more than one service animal. With respect to advance notice, we stated that airlines may require passengers traveling with ESAs or psychiatric service animals (PSAs) to provide advance notice, but not passengers traveling with other types of service animals, as DOT's disability regulation prohibits advance notice prior to travel unless specifically permitted in the regulation, as is the case with passengers traveling with PSAs or ESAs. As for proof that an animal is a service animal, we

3

stated that if a passenger's status as an individual with a disability is not clear, then an airline may ask about the passenger's need for a service animal and need not rely solely on paraphernalia such as an identification card, a harness, or a tag. With respect to check-in requirements, we stated that we intended to take enforcement action if airlines require passengers with service animals to check in at the lobby to process service animal documentation. We reasoned that DOT's disability regulation prohibits airlines from denying an individual with a disability the benefit of transportation or related services that are available to other persons, and airlines allow other passengers to check in electronically before arriving at the airport to avoid the inconvenience of checking in at the lobby. With respect to documentation, we stated that we generally did not intend to take enforcement action if airlines require ESA or PSA users to provide veterinary immunization records, health forms, and/or behavioral attestations since DOT's disability regulation permits airlines to ask for advance notice for passengers traveling with ESAs and PSAs, and allows airlines to deny boarding to an animal that poses a direct threat to the health or safety of others. Finally, with respect to containment, we indicated that we did not intend to take enforcement action if an airline imposed reasonable and appropriate measures to control the movement of ESAs in the cabin since DOT's disability regulation does not clearly specify whether or how airlines may restrict the movement of service animals in the cabin, and because we recognized the possibility that ESAs may pose greater in-cabin safety risks than other service animals.

General Comments Received

The comment period on the Interim Statement closed on June 7, 2018; we received a total of 94 comments.[1]  Disability advocates (including Paralyzed Veterans of America (PVA), the National Disability Rights Network (NDRN), the Bazelon Center for Mental Health Law/National Alliance on Mental Illness (Bazelon/NAMI), and the National Council on Disability (NCD)) expressed significant concern with the Interim Statement.[2]  Many advocates took the view that the Enforcement Office was improperly announcing in advance that it would not enforce certain ACAA violations, and was therefore abdicating its statutory duty to investigate all disability complaints.  We note, however, that the Enforcement Office investigates every formal and informal disability complaint, and we will continue to do so in accordance with our statutory obligation.

Advocates also expressed the view that abandoning enforcement of certain claims was arbitrary, capricious, and constitutes an abuse of discretion, which is subject to judicial review under the Administrative Procedure Act (APA).  Again, we emphasize that the Enforcement Office is not refusing to enforce certain ACAA violations.  We will continue to investigate all complaints alleging violations of the ACAA and Part 382 as it is currently written.  We will also continue to determine, within the traditional parameters of agency discretion, how best to use the Enforcement Office's limited resources to pursue enforcement action.  The factors affecting the exercise of that discretion include, among other things, the nature and extent of the violations,

---

[1] Most of the comments from individuals were germane to the ANPRM, rather than the Interim Statement, because they typically suggested ways in which the service animal regulation should be amended.  The comment of the National Council on Disability was received after the close of the comment period, but was considered.

[2]  The following disability advocates provided comments to the Interim Statement:  PVA; NDRN; Bazelon/NAMI; NCD; Psychiatric Service Dog Partners + Guide Dog Federation; Guide Dogs for the Blind; Guide Dogs of Texas; Operation Freedom Paws; American Association of People with Disabilities; Autistic Self-Advocacy Network; Disability Rights Education and Defense Fund; and The Arc of the United States.

the number of individuals harmed by the violations, the extent of the harm, and whether the conduct at issue clearly violates the regulatory text.[3]

A flight attendants' union (the Association of Flight Attendants-CWA) generally supported the Interim Statement but expressed concern about safety issues arising from increased use of ESAs. The Association of Flight Attendants-CWA reasoned that ESA issues should be addressed in the airport lobby, as far from the cabin of the aircraft as possible, to reduce the risk of injury to passengers and flight crew onboard the aircraft.

Individual airlines and Airlines for America (A4A) generally supported the Interim Statement. They expressed the view that the Interim Statement provided them the flexibility to address growing fraud and safety concerns with untrained service animals, particularly untrained ESAs. Airlines expressed considerable concern, however, with the Enforcement Office's expressed intention to use its resources to pursue action against airlines that require service animal users to check in at the lobby of the airport. We will discuss these comments, as well as the specific comments of stakeholders relating to other discrete issues, in greater detail below.

Comments and Responses on Topics Addressed in the Interim Statement

    *1. Species Restrictions*

In the Interim Statement, we stated that "[t]he Enforcement Office intends to exercise its enforcement discretion by focusing its resources on ensuring that U.S. carriers continue to accept the most commonly used service animals (i.e., dogs, cats, and miniature horses) for travel." 83 FR 23806. We indicated that the public interest would be better served by this exercise of our

---

[3] In the Interim Statement, we indicated that "to the extent that this interim statement of enforcement priorities conflicts with the Enforcement Office's 2009 Frequently Asked Questions guidance document (https://www.transportation.gov/airconsumer/frequently-asked-questions-may-13-2009), this more recent document will control." 83 FR 23805-23806. Similarly, to the extent that this Final Statement conflicts with prior service animal guidance, the Final Statement will control.

enforcement discretion because dogs, cats, and miniature horses are the most commonly used service animals.  We stated that while we will focus on ensuring the transport of dogs, cats and miniature horses, we may take enforcement action against carriers for failing to transport other service animals on a case-by-case basis.  We also stated that airlines are expected to continue to comply with the existing service animal regulation, which allows airlines to categorically deny transport only to certain unusual species of service animals such as snakes, other reptiles, ferrets, rodents, and spiders.[4]

Disability rights advocates generally expressed no specific objection to our position on species.  Airlines have asked us to declare that a wide variety of species (e.g., birds, hedgehogs, insects, and animals with hooves or horns) constitute "unusual service animals" that may be categorically banned.  They also contend that we have the authority to define "service animals" within this Final Statement, because "service animal" is not defined within Part 382 itself.  We recognize that the existing service animal regulation is not clear with respect to the species of animals that may be categorically banned as "unusual service animals." Nevertheless, these matters are more appropriately reserved to the rulemaking process that has begun with the Service Animal ANPRM.

In this Final Statement, after reviewing the comments on this issue, we believe that it would be in the public interest and within our discretionary authority to prioritize ensuring that the most commonly recognized service animals (i.e., dogs,[5] cats,[6] and miniature horses[7]) are

---

[4] 14 CFR 382.117(f).

[5] Service animals are limited to dogs under the Americans with Disabilities Act. See 28 CFR 36.104.

[6] Cats join dogs in being one of the two most common species that are used as ESAs. Service Animal Advocates Position and Reasoning, p. 8 at *https://www.regulations.gov/document?D=DOT-OST-2015-0246-0208* (September 15, 2016).

[7] Entities covered by the Americans with Disabilities Act are also required to modify their policies to permit trained miniature horses where reasonable. See 28 CFR 36.302.

accepted for transport.   In accordance with section 382.117(f), airlines will not be subject to enforcement action if they continue to deny transport to snakes, other reptiles, ferrets, rodents, and spiders; however, airlines will remain subject to potential enforcement action if they categorically refuse to transport other animals or species of animals.  Airline policies that categorically refuse transport to all service animals that are not dogs, cats, or miniature horses violate the current disability regulation.  The extent of enforcement action against these airlines will be determined on a case-by case basis, bearing in mind factors such as consumer complaints describing the harm to consumers from such policies.  We also note that, consistent with existing law, an airline may refuse transport to an individual animal regardless of species if the airline determines that specific factors preclude the animal from being transported as a service animal. These factors include a determination that the animal is too large or too heavy, poses a direct threat to the health or safety of others, or would cause a significant disruption in cabin service. 14 CFR 382.117(f).

*2. Number Limits*

The Department's service animal regulation is not clear as to whether airlines must allow passengers to travel with more than one service animal.   Section 382.117(a) states that an airline "must permit **a** service animal to accompany **a** passenger with a disability" (emphasis added). While this language could be read as suggesting that an airline is only required to transport one service animal per passenger, it could also be read as requiring airlines to transport any service animal needed by a particular passenger, even if that passenger needs the assistance of more than one such service animal.  Section 382.117(i) references guidance concerning carriage of service animals, which does not have independent mandatory effect, but rather describes how the Department understands the requirements of section 382.117.  That guidance states, "A single

passenger legitimately may have two or more service animals." See 73 Fed. Reg. 27614, 27661 (May 13, 2008).

As noted in the Interim Statement, the Enforcement Office has stated in the past that it would not subject airlines to enforcement action if airlines limit a passenger to transporting three service animals. See 83 FR 23806. In the Interim Statement, we noted that certain passengers may need the assistance of more than one task-trained service animal, as well as an ESA. We indicated that as a matter of enforcement discretion, our focus would be on ensuring that an airline allows a passenger to transport one ESA, and a total of three service animals if needed.

Disability rights organizations generally did not comment on this position; the two brief comments that we did receive were favorable. Airlines urged the Enforcement Office to ensure that it would not take enforcement action if the airline restricts a passenger to carrying one ESA and one task-trained service animal. Airlines also urged the Enforcement Office to authorize additional restrictions, such as allowing airlines to limit the total number of ESAs on any individual flight.

After reviewing the comments on this topic, we have decided that our enforcement efforts should continue to focus on ensuring that airlines are not restricting passengers from traveling with one ESA and a total of three service animals if needed. We share the view of the commenters that a single ESA would ordinarily be sufficient to provide emotional support on a given flight. However, we disagree with airline comments suggesting that the Enforcement Office should not take action against airlines that limit the total number of ESAs on a flight. While Part 382 may not be clear on the number of service animals each passenger may bring in the cabin, our view is that Part 382 plainly does not allow airlines to deny transport to a service animal accompanying a passenger with a disability because of a limit on the total number of

service animals that can be on any flight. Also, under the existing rule, an ESA is considered a service animal. As such, if ten qualified individuals with a disability each need to bring an ESA, then under Part 382 the airline must accept all ten ESAs, so long as the ESAs are sufficiently trained to behave in a public setting. Section 382.117(a) requires airlines to permit a service animal to accompany a passenger with a disability, with no stated limitation based on the number of other passengers with service animals. We also note that section 382.17 prohibits airlines from limiting the number of passengers with a disability on a flight. For enforcement purposes, we will continue to address each complaint that we receive alleging a violation of the Department's current service animal rules on a case-by-case basis, bearing in mind the specific circumstances of the matter, including the passenger's genuine need for multiple service animals, particularly those that are task-trained.[8]

### 3. Advance Notice

In the Interim Statement, we explained our view that the plain language of Part 382 prohibits carriers from requiring advance notice for passengers traveling with service animals other than ESAs or PSAs, unless the flight segment is 8 hours or more. Requiring advance notice of a passenger's intention to travel with a service animal outside of these specific circumstances violates the Department's regulation. 14 CFR 382.27(a). We received only three comments on this specific topic. All three comments addressed the wisdom of the rule itself, as opposed to our interpretation or enforcement of that rule.[9] In this Final Statement, we see no basis for deviating from the Interim Statement, because it represents a straightforward recitation of established law.

---

[8] Outside of the ESA context, complaints to the Enforcement Office involving multiple service animals are rare.

[9] PSDP contended that the current rule discriminates against passengers with psychiatric disabilities, but noted that in light of the fact that new rules will be proposed, it is not "pushing for any alteration in DOT's proposed interim enforcement plan when it comes to advance notice." Comment of PDSP at 7.

The Enforcement Office intends to focus its resources on ensuring that airlines do not require advance notice for passengers traveling with service animals other than ESAs or PSAs, unless the flight segment is 8 hours or more, because advance notice may significantly harm passengers with disabilities as it prevents them from making last minute travel plans that may be necessary for work or family emergencies.

### 4. Proof that an Animal is a Service Animal

In the Interim Statement, we addressed airlines' concerns that passengers may be attempting to pass off their pets as service animals by purchasing easily obtained paraphernalia such as harnesses, vests, and tags. We explained our view that under the existing rule, airlines may continue to seek credible verbal assurance that the passenger is an individual with a disability and that the animal is a service animal. Specifically, "[i]f a passenger's status as an individual with a disability is unclear (for example, if the disability is not clearly visible), then the airline personnel may ask questions about the passenger's need for a service animal. For example, airlines may ask, "how does your animal assist you with your disability?" A credible response to this question would establish both that the passenger is an individual with a disability and that the animal is a service animal." 83 FR 23806. Stakeholders did not express disagreement with this position. In this Final Statement, we see no reason to deviate from the analysis of the Interim Statement because it represents a well-established interpretation of existing law.

### 5. Check-in Requirements

In the Interim Statement, we noted that certain airlines now require passengers with service animals to appear in person at the lobby[10] of the airport before the flight to verify that the

---

[10] According to A4A and United Airlines, Inc. (United), "ticket counter" is an outdated term, and the more appropriate term is the "lobby."

animal can be transported as a service animal. We also noted that airlines generally allow electronic check-in, a process that typically permits passengers to skip the lobby and proceed directly to the gate if they do not have checked bags. We reasoned that requiring passengers with service animals to check in at the lobby would deny such passengers a benefit of electronic check-in that is available to other persons who do not have service animals. Accordingly, we concluded that "the Enforcement Office intends to act should an airline require that a passenger with a service animal check-in at the ticket counter, thereby denying those passengers the same benefits that are available to other passengers." 83 FR 23806.

Disability advocates generally supported this position for many of the reasons stated by the Department. Flight attendants (AFA-CWA) disagreed, however, stating that airlines should have the authority to process oversized and poorly behaved animals in the lobby, rather than in the gate area/sterile area. Flight attendants stressed that for the safety of passengers and its members, airlines should address these issues as soon as possible and as far from the aircraft as possible, because available options are reduced as the animal gets closer to boarding the aircraft.

Similarly, airlines expressed substantial concerns with our position. They contend that the Interim Statement represents a significant and unexpected new regulation, issued without the Department first engaging in the full notice and comment procedures required by the Administrative Procedure Act. They also argue that the Interim Statement is based on the incorrect premise that "lobby verification" discriminates on the basis of disability. In the airlines' view, lobby verification is nondiscriminatory because it is based on the presence of an animal, not the presence of a disability. They note, for example, that airlines also require passengers with pets to appear in the lobby for processing. A4A and the International Air Transport Association (IATA) filed a joint comment noting that many airlines require lobby

check-in for passengers with and without disabilities who travel with an animal in the cabin and emphasized that only passengers with traditional service animals (such as guide dogs) are exempted. Airlines assert that lobby agents, rather than gate agents, are in the best position (both logistically and in terms of expertise) to process animals for transport in the cabin. Airlines also mentioned that certain carriers have already invested in training specialized lobby personnel to process passengers with animals, and that other carriers are experimenting with systems where agents do not appear at gates. Finally, they contend that to minimize the risk of injury to airline personnel and other passengers, it is critical to verify service animal documentation and other requirements (such as the presence of harnesses or leashes, and whether the animal will fit in the passenger's foot space) as far from the confines of the aircraft cabin itself as possible.

As noted above, the purpose of the Final Statement is to inform the public of the Enforcement Office's priorities, not to announce or make new rules or to declare that certain classes of violations will not be enforced. After carefully reviewing the comments submitted and taking a closer look at Part 382, we have arrived at the view that lobby verification is permitted under Part 382 for ESAs and PSAs, because an airline is permitted to exclude a person with a disability from a benefit that is available to other persons where specifically permitted by Part 382. Here, the benefit is the ability to check-in online and proceed directly to the gate, but airlines are permitted under Part 382 to require ESA and PSA users to check in one hour before the check-in time for the general public. For that reason, the Enforcement Office does not view it to be a violation of Part 382 if airlines require lobby check-in for passengers with ESAs or PSAs.

More specifically, section 382.11(a)(3) states that airlines may not exclude an individual with a disability from or deny the person the benefit of any air transportation or related services

13

that are available to other persons, except where specifically permitted by Part 382. Section 382.43(c) requires airlines to have an accessible web site which, among other things, would enable a passenger with a disability to check-in for a flight online, similar to other passengers, thereby skipping the lobby and proceeding directly to the gate if he/she does not have checked bags. However, section 382.27(c)(8) allows airlines to require a passenger with a disability to provide up to 48 hours' advance notice and check in one hour before the check-in time for the general public in order to transport an ESA or PSA in the cabin. In our view, at the time that this section was enacted in 2008, the phrase "check in" generally meant presenting oneself in person at the airline's ticket counter. As such, we believe that Part 382 as written does contemplate that airlines may require passengers travelling with ESAs or PSAs to present themselves in person in the lobby before proceeding into the secured area. In any event, we do not intend to exercise our enforcement discretion to take action against airlines that impose such a requirement on passengers travelling with ESAs or PSAs. In our view, however, the regulations do not permit airlines to require "check in one hour before the check-in time for the general public" for non-ESA/PSA service animals, or to require that passengers with traditional service animal users appear in the lobby for processing. The Enforcement Office intends to act should an airline require that a passenger with a traditional (non-ESA/PSA) service animal check-in at the lobby of an airport.

6. *Direct Threat Analysis - Documentation Requests for ESAs and PSAs*

In the Interim Statement, we explained that airlines may refuse transportation to any service animal that poses a direct threat to the health or safety of others. We observed, however, that our service animal regulation does not explain how airlines may (or may not) make that assessment. We also noted that airlines may require 48 hours' advance notice of a passenger

wishing to travel with an ESA or PSA in order to provide the carrier the necessary time to assess the passenger's documentation. We concluded that "the Enforcement Office does not intend to use its limited resources to pursue enforcement action against airlines for requiring proof of a service animal's vaccination, training, or behavior for passengers seeking to travel with an ESA or PSA." 83 FR 23807. We also indicated that we would continue to monitor the types of information that airlines require from ESA or PSA users to ensure that travel with those animals is not made unduly burdensome or effectively impossible. Airlines strongly supported this position, on the basis that documentation helps personnel to determine whether an ESA or PSA is a direct threat. Airlines have expressed concern to the Department that passengers are increasingly bringing untrained animals onboard aircraft putting passengers and flight crew at risk.

Survey data of PSA and ESA users provided by the United Service Animal Users, Supporters, and Advocates (USAUSA) revealed that almost 90% of the 919 survey respondents indicated that they were concerned about untrained or stressed animals interfering with or harming their animal when they fly. However, Psychiatric Service Dog Partners (PSDP) emphasized that mandates for third-party documentation do not improve safety and serve only to increase burdens to passengers with disabilities. As evidence of the burden that documentation requirements impose on passengers with disabilities, PSDP points to the USAUSA survey, which provides estimates on the cost and time that it would take to obtain additional third-party documentation, and the degree to which such additional burdens affect users' willingness to fly. PSDP also stressed that each additional documentation creates an incremental additional burden for passengers seeking to fly with a service animal.

Similarly, other disability rights organizations contended that additional documentation is unduly burdensome and represents a deterrent to travel without providing real benefits to airlines. Operation Freedom Paws expressed the view that obtaining a behavioral attestation from a veterinarian would be unduly burdensome, because such documentation is difficult to obtain within 48 hours of travel. The International Association of Canine Professionals and the American Veterinary Association expressed the view that any attestations about an animal's behavior should come from the passenger and not from the professional, because professionals are not able to make such attestations.

Some disability advocates, such as Bazelon/NAMI, also believe that the Department would be acting arbitrarily and capriciously if it allowed airlines to require additional service animal documentation beyond what is explicitly permitted in Part 382. Similarly, the National Council on Disability asserts that "the additional proof insisted upon by airlines is not legal under the ACAA regulation" because Part 382 does not clearly authorize that additional proof.[11]

In this Final Statement, we continue to focus our enforcement efforts "on clear violations of the current rule that have the potential to adversely impact the largest number of persons." 83 FR 23805-23806. In general, it is not clear whether airlines are violating Part 382 if they require additional documentation to determine whether a service animal poses a direct threat. Part 382 permits airlines to determine, in advance of flight, whether any service animal poses a direct threat. However, that section is not clear about how airlines would determine whether an animal poses a direct threat to the health or safety of others.

While section 382.117 clearly sets forth the type of medical documentation that airlines may request from ESA and PSA users to reduce likelihood of abuse by passengers wishing to

---

[11] Comment of NCD at 1, available at https://www.regulations.gov/document?D=DOT-OST-2018-0067-0097.

travel with their pets, the regulation does not explicitly permit or prohibit the use of additional documentation related to a service animal's vaccination, training, or behavior. Accordingly, we do not intend to take action against an airline for asking service animal users to present documentation related to a service animal's vaccination, training, or behavior, so long as it is reasonable to believe that the documentation would assist the airline in determining whether an animal poses a direct threat to the health or safety of others.

As noted above, Part 382 clearly allows airlines to require 48 hours' advance notice to receive the requested accommodation of transporting ESAs and PSAs.[12] Therefore, we do not intend to take action against an airline asking an ESA/PSA service animal user to present such documentation up to 48 hours before his or her flight. We will monitor airlines' policies that require service animal users to provide documentation to ensure the documentation is not being used to prevent passengers with disabilities from traveling with their service animals (e.g., an airline requiring a form from a veterinarian guaranteeing how an animal would behave on an aircraft, documentation which virtually all veterinarians would be unwilling to sign).

*7. Containing Service Animals in the Cabin*

In the Interim Statement, we observed that Part 382 does not clearly specify whether or how airlines may restrict the movement of service animals in the cabin. We noted that ESAs may pose greater in-cabin safety risks because they may not have undergone the same level of training as other service animals (including PSAs). Accordingly, we stated that we would not take action against carriers that impose reasonable restrictions on the movement of ESAs in the cabin so long as the reason for the restriction is concern for the safety of other passengers and

---

[12] The preamble to the 2008 final rule on "Nondiscrimination on the Basis of Disability in Air Travel" clarifies that "advance notice" refers to notice provided in advance of the scheduled departure time of the flight. See 73 FR 27614, 27649 (May 13, 2008).

crew. We stated that such restrictions may include requiring, where appropriate for the animal's size, that the animal be placed in a pet carrier, the animal stay on the floor at the passenger's feet, or requiring the animal to be on a leash or tether. 83 FR 23807 (May 23, 2018).

Comments were mixed concerning this issue. Airlines contend that movement, harness, and leash restrictions are generally consistent with the Americans with Disabilities Act (ADA). A4A also asked the Department to clarify that they may refuse transportation to an animal in the cabin unless the passenger demonstrates that the animal does not exceed relevant weight limits and will safely fit in the passenger's lap or foot space. American Airlines contended that it is particularly important for cats to be held in a carrier because of allergy concerns and hygiene issues. A4A also asked the Department to make clear that flight attendants are not required to ask other passengers to trade seats or give up their foot space to accommodate large service animals.

Disability rights advocates took a range of positions. For example, Bazelon/NAMI contended that allowing airlines to require containment solely for passengers traveling with an ESA is "prohibited under the ACAA." Comment of Bazelon/NAMI at 3. PSDP supported requirements that service animals be tethered, "if not contained in a pet carrier and with reasonable exceptions, such as those that are disability-based." Comment of PSDP at 16. Many commenters, including PSDP and American Airlines, noted the challenging issues surrounding service animals that are required to be transported in the cabin, but are too large to be contained in a pet carrier.

In this Final Statement, we again observe that Part 382 contains no explicit requirements or prohibitions with respect to containment of ESAs (or other service animals) in the cabin. As with other issues discussed above, we decline to declare that the Enforcement Office will not

take enforcement action with respect to containment of service animals in all cases. Rather, we will consider containment issues for all service animals on a case-by-case basis, with a focus on reasonableness. For example, in general, tethering and similar means of controlling an animal that are permitted in the ADA context would appear to be reasonable in the context of controlling service animals in the aircraft cabin. Other factors bearing on reasonableness include, but are not limited to, the size and species of the animal, the right of other passengers to enjoy their own foot space,[13] and the continued ability of the animal to provide emotional support or perform its task while being restrained or kept in a pet carrier.

We will apply this enforcement approach to containment of all service animals, rather than only ESAs, because we have reconsidered our position from the Interim Statement that would have drawn a distinction between movement restrictions for ESAs and movement restrictions for other types of service animals. As Bazelon/NAMI noted in their comments, all service animals (including ESAs) are expected to behave in public. We also note that an animal's status as a task-trained service animal does not preclude the animal from misbehaving. Accordingly, we agree with Bazelon/NAMI about the inappropriateness of making a distinction between ESAs and non-ESA service animals with respect to the importance of the owner controlling and restricting the movement of the animal.

---

[13] We recognize that guidance on the issue of a service animal encroaching on the foot space of a passenger is not clear. DOT has previously stated that service animals may be placed at the feet of a passenger with a disability so long the animal does not extend into the foot space of a passenger who does not wish to share that space with the animal. See FAA Order 8400.10, Bulletin FSAT 0401A and https://www.transportation.gov/sites/dot.gov/files/docs/TAM-07-15-05_0.pdf . Later, DOT has stated that a service animal may need to use a reasonable portion of an adjacent seat's foot space that does not deny another passenger effective use of the space for his or her feet by taking all or most of the passenger's foot space. https://www.transportation.gov/sites/dot.gov/files/docs/Part%20382-2008_1.pdf. https://www.transportation.gov/sites/dot.gov/files/docs/FAQ_5_13_09_2.pdf (Question 37). This matter is best addressed in notice and comment rulemaking.

New Topics

After the comment period closed, airlines continued to announce new restrictions on the transportation of service animals. Some of those policies were variations on prior policies, while others raised new issues such as restrictions concerning the breed, age, or weight of the animal. Our responses to these new policies are set forth below.

*1. Breed Restrictions*

After the comment period for the Interim Statement closed, certain airlines instituted new policies banning "pit bull type dogs" as service animals on their flights. The Department's disability regulation allows airlines to deny transport to an animal if, among other things, it poses a direct threat to the health or safety of others. However, the Department is not aware of and has not been presented with evidence supporting the assertion that an animal poses a direct threat simply because of its breed. On June 22, 2018, the Enforcement Office issued a public statement indicating its view that "a limitation based exclusively on breed of the service animal is not allowed under the Air Carrier Access Act."[14] The Enforcement Office continues to take the view that restrictions on specific dog breeds are inconsistent with the current regulation. As stated

---

[14] In full, the statement reads: "Under DOT's current rules implementing the Air Carrier Access Act, airlines are required to accommodate passengers with disabilities who depend on the assistance of service animals within limits. Airlines are not required to accommodate unusual service animals, such as snakes, reptiles, ferrets, rodents, and spiders. Recently, the Department issued a Statement of Enforcement Priorities on Service Animals to inform airlines and the public that its Aviation Enforcement Office intends to exercise its enforcement discretion by focusing its limited resources on ensuring that U.S. airlines continue to accept the most commonly used service animals such as dogs for travel. A limitation based exclusively on breed of the service animal is not allowed under the Department's Air Carrier Access Act regulation. However, an airline may refuse to carry service animals if the airline determines there are factors precluding the animal from traveling in the cabin of the aircraft, such as the size or weight of the animal, whether the animal would pose a direct threat to the health or safety of others, whether it would cause a significant disruption of cabin service, or whether the law of a foreign country that is the destination of the flight would prohibit entry of the animal. The Department's Office of Aviation Enforcement and Proceedings investigates every disability complaint that it receives involving airline service, including investigating complaints from passengers alleging an airline denied them travel by air with a service dog. At the conclusion of an investigation, a determination is made as to whether the law was violated. In enforcing the requirements of Federal law, the Department is committed to ensuring that our air transportation system is safe and accessible for everyone."

earlier, the Enforcement Office intends to use available resources to ensure that dogs as a species are accepted for transport.  Consistent with existing law, airlines are permitted to find that any specific animal, regardless of breed, poses a direct threat based on behavior.  14 CFR 382.117(f).

### 2. Age Restrictions

After the comment period to the Interim Statement closed, certain airlines announced that they would not accept service animals of any type that are younger than four months old.  Part 382 does not address the minimum age of a service animal.  However, all service animals (including ESAs) are expected to be sufficiently trained to behave in public.[15]  We do not expect service animals to have completed public access training by the age of four months.[16] Accordingly, as a general matter, we do not envision that it would be a violation of Part 382 to prohibit the transport of service animals younger than four months, as those animals would not be trained to behave properly in a public setting, and we in any event do not anticipate exercising our enforcement discretion to take action against airlines that implement such prohibitions.

### 3. Weight Restrictions

After the comment period to the Interim Statement closed, at least one airline announced that it would not accept ESAs or PSAs over 65 pounds.[17]  Section 382.117(f) allows airlines to determine whether factors preclude a given service animal from being transported in the cabin.

---

[15] The preamble of the Department's 2008 final rule on "Nondiscrimination on the Basis of Disability in Air Travel" states that ESAs "must be trained to behave appropriately in a public setting." See 73 FR 27614, 27659 (May 13, 2008).

[16]  According to the International Association of Assistance Dog Partners, an assistance dog should be given 120 hours of public access training over a period of six months or more.  See https://www.iaadp.org/iaadp-minimum-training-standards-for-public-access.html.

[17]  It is unclear why the airline imposed the 65-pound limit only on ESAs and PSAs, and did not include other service animals, aside from an apparent view that large ESAs and PSAs pose greater safety threats than other types of large service animals.  As we indicate in the section on containment, however, airlines have other means of ensuring safety for large animals aside from banning them outright.

These factors include "whether the animal is too large or too heavy to be accommodated in the cabin, whether the animal would pose a direct threat to the health or safety of others, whether it would cause a significant disruption of cabin service, [or] whether it would be prohibited from entering a foreign country that is the flight's destination." Importantly, the rule further provides that "if no such factors preclude the animal from traveling in the cabin, you must permit it to do so." 14 CFR 382.117(f). Under this rule, an animal may be excluded from the cabin if it is too large or too heavy to be accommodated in the specific aircraft at issue. However, in our view, a categorical ban on animals over a certain weight limit, regardless of the type of aircraft for the flight, is inconsistent with section 382.117. We also note that the FAA's guidance pertaining to the location and placement of service animals on aircraft (FAA Order 8900.1, Vol. 3, Ch. 33, Section 6 at ¶ 3-3546) does not indicate that animals over a certain size must be categorically prohibited from the cabin on the basis of safety. We will continue to monitor this issue and to take enforcement action as appropriate.

### 4. *Flight-Length Restrictions*

After the comment period to the Interim Statement closed, at least one airline announced that it would not accept ESAs on flights lasting eight hours or more. In our view, Part 382 as written clearly prohibits such policies. Specifically, section 382.117(a)(2) provides that, as a condition of permitting any service animal to travel in the cabin on flights scheduled to take eight hours or more, airlines may require the passenger using the service animal to provide documentation that the animal will not need to relieve itself on the flight or that it can do so in a way that does not create a health or sanitation issue on the flight. Pursuant to section 382.27(a)(9), airlines may require 48 hours' advance notice and check-in one hour before the check-in time for the general public in order to accommodate any service animal on a flight

scheduled to last eight hours or more.  Thus, in our view, while Part 382 permits airlines to ask

for documentation, advance notice, and early check-in to transport service animals on flights

scheduled to last eight hours or more, the rule does not permit airlines to prohibit service animals

outright on such flights.  The Enforcement Office intends to use its available resources to ensure

that airlines comply with existing regulations with respect to this issue.

5. *Letter or Form from a Mental Health Professional for an ESA or PSA User*

After the comment period on the Interim Statement closed, several airlines announced

that they would restrict the types of medical forms that they would accept from users of ESAs

and PSAs.  Specifically, these airlines indicated that they would not accept documentation on the

letterhead of a licensed mental health professional treating the passenger's mental or emotional

disability; instead, they would only accept the medical forms found on the airlines' own web

sites.  In our view, Part 382 clearly prohibits this practice.  Section 382.117(e) states that an

airline is not required to accept an ESA or PSA for transportation in the cabin unless the

passenger provides medical documentation that meets the specific criteria of section

382.117(e).[18]  A document can meet the specific criteria of section 382.117(e) without being a

form created by an airline.  In other words, while an airline may ask or encourage a passenger to

request that the licensed mental health professional treating the passenger fills out the airline's

own proprietary medical form, airlines may not reject a medical form or letter that meets the

---

[18]  Section 382.117(e) states that airlines may refuse transportation of an ESA or PSA in the cabin unless the
passenger provides documentation, no older than one year from the date of the passenger's scheduled initial flight,
on the letterhead of a licensed mental health professional, stating that:  (1) the passenger has a mental or emotional
disability recognized in the Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition; (2) the
passenger needs the ESA or PSA as an accommodation for air travel and/or for activity at the passenger's
destination; (3) the individual providing the assessment is a licensed medical health professional, and the passenger
is under his or her professional care; and (4) the date and type of the mental health professional's license and the
state or other jurisdiction in which it was issued.

criteria found in the rule. The Enforcement Office intends to use its available resources to ensure that airlines comply with the existing regulation with respect to this issue.

> 6. *Direct Threat Analysis - Documentation Requests for Traditional Service Animals*

After the comment period on the Interim Statement closed, at least one airline indicated that it would ask, but not require, passengers with all types of service animals (including traditional service animals such as guide dogs) to carry veterinary forms, to be presented to airline personnel on request.

As we explained in the documentation section above, Part 382 permits airlines to determine, in advance of flight, whether any service animal poses a direct threat, but the rule does not clearly indicate how airlines must make that assessment. Accordingly, we do not intend to take action against an airline for asking users of any type of service animal to present documentation related to the service animal's vaccination, training, or behavior, so long as it is reasonable to believe that the documentation would assist the airline in making a determination as to whether an animal poses a direct threat to the health or safety of others.

However, Part 382 draws relevant distinctions between ESA/PSAs and other types of service animals relating to advance notice. Section 382.27(a) provides that, subject to certain exceptions (including travel with an ESA or PSA), airlines may not require passengers with disabilities to provide advance notice in order to obtain services or accommodations required by law. Therefore, if an airline requires a non-ESA/PSA service animal user to present documentation related to a service animal's vaccination, training, or behavior before the check-in time for the general public, such action in our view clearly violates the advance notice provisions of section 382.27 and we will take enforcement action appropriately.

**Final Statement of Enforcement Priorities**

The purpose of this Final Statement is to provide the public with greater transparency with respect to the Enforcement Office's interpretation of existing requirements and its exercise of enforcement discretion surrounding service animals. Our enforcement efforts will be focused on clear violations of the current rule that have the potential to impact adversely the largest number of persons. These determinations will be made on a case-by-case basis.

This guidance is not legally binding in its own right and will not be relied on by the Department as a separate basis for affirmative enforcement or other administrative penalty. Conformity with this guidance (as distinct from existing statutes and regulations at Part 382) is voluntary only, and nonconformity will not affect rights and obligations under existing statutes and regulations.

1. **Species and Breed Restrictions.** The Enforcement Office intends to use available resources to ensure that dogs, cats, and miniature horses are accepted for transport. Airline policies that categorically refuse transport to all service animals that are not dogs, cats, or miniature horses violate the current disability regulation. Categorical restrictions on dog breeds are inconsistent with Part 382 and the Department's enforcement priorities. Airlines will not be subject to enforcement action if they continue to deny transport to snakes, other reptiles, ferrets, rodents, and spiders; however, airlines will remain subject to potential enforcement action if they categorically refuse to transport other animals.

2. **Number Restrictions.** We will focus our enforcement efforts on ensuring that airlines are not restricting passengers from traveling with one ESA and a total of three service animals if needed. Airlines may not impose categorical restrictions on the total number of service animals to be transported in the aircraft cabin.

3. **Weight Restrictions.** Airlines may not impose a categorical restriction on service animals over a certain weight, without regard to specific factors that would preclude transport of that animal in the cabin.

4. **Age Restrictions.** We do not anticipate exercising our enforcement resources to ensure the transport of service animals that are clearly too young to be trained to behave in public.

5. **Flight-Length Restrictions.** Airlines may not categorically restrict service animals on flights scheduled to last 8 hours or more, and would be subject to potential enforcement action if they do so. On flights scheduled to last 8 hours or more, airlines may ask for 48 hours' advance notice, early check-in, and documentation that the animal will not need to relieve itself on the flight or that it can do so in a way that does not create a health or sanitation issue on the flight.

6. **Proof that an Animal is a Service Animal**. If a passenger's disability is not clear, airlines may ask limited questions to determine the passenger's need for the animal even if the animal has other indicia of a service animal such as a harness, vest, or tag.

7. **Documentation Requirements.** We do not anticipate taking enforcement action against an airline for asking users of any type of service animal to present documentation related to the animal's vaccination, training, or behavior, so long as it is reasonable to believe that the documentation would assist the airline in determining whether an animal poses a direct threat to the health or safety of others. We will monitor airlines' animal documentation requirements to ensure that they are not being used to unduly restrict passengers with disabilities from traveling with their service animals. Airlines may ask or encourage an ESA and PSA user to submit the medical form provided on the airline's

web site, but may not reject documentation provided by an ESA or PSA user from a licensed mental health professional treating the passenger that meets all of the criteria found in the rule itself.

8.  **Lobby Verification.**  We do not anticipate taking enforcement action against an airline if it requires passengers with ESAs or PSAs to present service animal documentation in the lobby/ticket counter area, rather than the gate/sterile area.

9.  **Advance Notice/Check-In.**  Airlines may require ESA/PSA users to provide up to 48 hours' advance notice of travel with an ESA/PSA, and may require ESA/PSA users to appear in the lobby for processing of service animal documentation up to one hour prior to the check-in time for the general public.  However, airlines may not require non-ESA/PSA users to provide advance notice of travel with a service animal, or require non-ESA/PSA users to appear in the lobby for processing of service animal documentation.

10. **Containment.**  We will exercise our discretion with respect to containment issues for all service animals on a case-by-case basis, with a focus on reasonableness.  For example, in general, tethering and similar means of controlling an animal that are permitted in the ADA context would appear to be reasonable in the context of controlling service animals in the aircraft cabin.  Other factors bearing on reasonableness include, but are not limited to, the size and species of the animal, the right of other passengers to enjoy their own foot space, and the continued ability of the animal to provide emotional support or perform its task while being restrained or kept in a pet carrier.

**Effective Date**

This Final Statement is effective upon publication.  Airlines are expected to review their policies and revise them, if necessary, to comply with the Department's disability regulation.

As a matter of enforcement discretion, we intend to refrain from taking enforcement action with respect to the issues set forth in this Final Statement for a period of up to 30 days from the date of publication so long as the airline demonstrates that it began the process of compliance as soon as this notice was published in the Federal Register. This timeframe should provide airlines with adequate time to review and revise their policies as needed to comply with the ACAA and the Department's disability regulation.

Issued this 8th day of August, 2019, in Washington, D.C.

/original signed/
_____
James C. Owens,
Deputy General Counsel,
U.S. Department of Transportation.